MEMORANDUM OF DECISION
On August 16, 2001 the Department of Children and Families (DCF) filed a petition to terminate the parental rights of Cori B. and John W. as to their son Joseph. Respondent parents were properly served with the petition[2] and Ms. B. was represented by counsel throughout the court proceedings.[3] This court has jurisdiction in this matter and there is no pending action affecting custody of the child in any other court. The statutory grounds alleged for both respondent parents are: abandonment, failure to rehabilitate, and no ongoing parent-child relationship. The termination of parental rights trial commenced on January 9, 2002 and concluded on January 10, 2002.[4]
The court makes the following findings of fact and conclusions of law by clew and convincing evidence.
Joseph was born on January 2001. Within a few weeks of his birth, Joseph was rehospitalized and diagnosed with RSV, a respiratory infection. Joseph is susceptible to repeated respiratory problems and has been diagnosed with bronchiolitis. Joseph has been designated medically fragile and his health requires daily monitoring and medication.
Corey B. has given birth to three children, none of whom are in her care. Respondent mother, who is thirty years old, has suffered from CT Page 597 mental health issues at least since late adolescence. Ms. B.'s psychiatric illness is severe and complex.[5] Ms. B. can be very uncooperative and exhibit anywhere from sexually provocative to delusional to physically threatening and assaultive behavior. In January of 2000, the Dixwell Newhallville Community Mental Health Center assumed the task of attempting to do a comprehensive mental health evaluation of Ms. B. Over a three month period, from January to March of 2000, Mr. Robert Page, a licensed social worker and the director of the Dixwell Newhallville Community Mental Health Center, and Dr. Blue, the Center's consulting psychiatrist, met regularly with respondent mother. She was diagnosed with a psychotic disorder, NOS (not otherwise specified), and in March of 2000 Ms. B. was prescribed the antipsychotic drug, Zyprexa.[6] Respondent mother was dual diagnosed as a substance abuser, primarily marijuana but sometimes cocaine.
In 2000, prior to knowing about Ms. B.'s pregnancy of Joseph, it was DCF's plan to attempt to reunify Ms. B. with Joseph's half brother, Tosj. To that end it was decided that Mr. Page and his agency would coordinate with other service providers, specifically MANOS (Maternal and Newborn Outreach Support Program) and with the New Haven Home Recovery Program to deal with Ms. B.'s mental health issues, her substance abuse issues, her homelessness, her need for vocational training or securing social security disability, her reunification with Tosj and eventually prenatal care for the unborn Joseph.[7] Sadly, once respondent mother left the in patient substance abuse program and refused to re-continue the Zyprexa, the reunification efforts, regarding Tosj, failed.
On January 19, 2001 DCF obtained an order of temporary custody of Joseph and filed neglect petitions as to Joseph. On April 24, 2001 Joseph was adjudicated neglected and uncared for based on a default judgment as to both respondent parents and the child was committed to DCF. Joseph has remain committed to DCF and has resided in the same foster home since his discharge from the hospital at the time of his birth.
DCF made reasonable efforts to locate the respondent parents.
Ms. B. told DCF that Joseph's father was John W. Ms. B. did not give any further information regarding the putative father, nor was any father's name listed on Joseph's birth certificate. As part of its diligent search, DCF called the telephone company with the name of John W. and was supplied a telephone number. DCF called the number and spoke to a woman who did not identify herself She told DCF that Mr. W. did not live at the residence. Nonetheless, on January 30, 2001 Mr. W. called DCF. Mr. W. admitted he knew Corey B. and agreed to take a paternity test because he questioned whether he was the father of Joseph. DCF informed him of the February 2, 2001 court date and he said he would be present. CT Page 598 Mr. W. never appeared, he never made further contact with DCF and when DCF called back the original telephone number no one answered.
DCF was involved with Ms. B. prior to Joseph's birth regarding her other children. Ms. B. kept contact with DCF until March of 2001. Her whereabouts became unknown and DCF did not have contact with respondent mother until July of 2001. It was in July of 2001 that DCF learned that mother had been incarcerated since May of 2001. Ms. B. remains incarcerated and is due to be released from prison in February of 2002.
DCF made reasonable efforts to reunify Joseph with his parents. Obviously, Mr. W.'s failure to present himself to DCF or to the court, or to have involvement with Joseph made reunification efforts impossible.
As to Ms. B., DCF attempted a comprehensive, aggressive reunification plan. The plan, initially promulgated to reunify Ms. B. and Tosj, addressed the multitude of problems that had to be addressed. Ms. B. was to receive weekly psychotherapy and medication from the community mental health center. Mr. Page went to great lengths to deal with Ms. B.'s chronic homelessness. In order to qualify for city assisted housing Ms. B. had to prove she was substance abuse free for ninety days. In an attempt to secure her sobriety the service providers secured her an in patient bed in the Amethyst House. Ms. B. left the program after thirty days and failed to ever provide the requisite clean urines. Even after Ms. B. was repeatedly asked to leave or was forced to leave various shelters, Mr. Page would intervene and negotiate Ms. B.'s return. When Ms. B. chose to sleep on abandoned property the hospital of St. Raphael's would provide her with clothing and blankets. The community mental health center, on at least three occasions, paid for Ms. B.'s stay in hotels and both the health center and MANOS would provide Ms. B. with tokens for transportation. Respondent mother received SAGA, cash assistance, and there was an attempt, after obtaining Ms. B.'s labor record, to secure her social security disability payments. Ms. B. never followed through with the process.
The reunification plan, that was formulated in mid 2000, was obviously contingent on Ms. B. taking her psychiatric medication and not abusing substances. It was a plan that appeared to be working around the time of Thanksgiving of 2000. Although the plan was initially meant to reunify Ms. B. with her son Tosj, the plan was amended to include prenatal care concerning Joseph. There was an understanding with the prenatal clinic at the Hospital of St. Raphael's that if Ms. B. missed an appointment she was free to come in when she remembered or when she could make it and she would be accomodated, [accommodated].
Concerned about the potentially detrimental effect Zyprexa could have CT Page 599 on her pregnancy, Ms. B. stopped taking the medication and refused to re-continue it even though Dr. Blue and Mr. Page told her that it was safe to do so after the first trimester of pregnancy. As her pregnancy with Joseph progressed, her psychiatric illness escalated and the reunification plan regarding Tosj fell apart.[8]
DCF's plan, after securing an order of temporary custody upon Joseph's birth, was to provide reunification services to Ms. B. as to Joseph. Ms. B. initially refused to re-engage in treatment with Mr. Page and she refused to take medication. DCF obtained insurance for Ms. B. but could not find another mental health clinician or agency who would service Ms. B. Simultaneously, however, Ms. B. agreed to re-engage with Mr. Page and the Health Center. However respondent mother never presented at the center and except for telephone contact in January of 2001, Mr. Page and the mental health center have had no further contact with Ms. B. Ms. B. never re-registered to submit to mandatory urines and she missed two appointments made by DCF for substance abuse treatment at ABH. Homelessness continued to be a problem for Ms. B. and local shelters refused to grant her admission due to past disruptive behavior.
DCF offered visitation between Ms. B. and Joseph. Ms. B. missed a January visit and a supervised visit with mother and child was attempted while Joseph was hospitalized in late January 2001, but mother was inappropriate and abruptly left the hospital prior to a visit. A visit between respondent mother and both her sons occurred, without incident, in February of 2001.[9]
There was a March visit between just Ms. B. and her sons at the DCF office. Toward the end of the visit Ms. B. began to get upset and her behavior escalated to the point where security had to be called. Ms. B. was holding Joseph and refused to relinquish possession of him as she verbally lashed out at DCF personnel. Tosj was present for the initial stages of the confrontation and became upset. It took over an hour to talk Ms. B. into giving Joseph back to DCF. During the encounter there was an extreme concern about Joseph's physical safety given the way Ms. B. held the infant and her demeanor.
After consulting with Mr. Page, DCF suspended visits between Joseph and Ms. B. pending her re-entering in mental health and substance abuse treatment. Ms. B. was informed of the suspension of visits by telephone on March 20, 2001. Ms. B. never furnished any proof that she sought such treatment. DCF never heard from Ms. B. after the March telephone conversation until July, 2001 when DCF found out she was incarcerated and had been since May of 2001. Ms. B. never requested to again visit with Joseph until a court hearing sometime after June of 2001. The court denied respondent mother's request for visitation. CT Page 600
Reasonable efforts were made to reunify Ms. B. with Joseph. Unfortunately, Ms. B.'s unwillingness or inability to engage and stay engage in treatment made all efforts to reunify futile.
STATUTORY GROUNDS
 Abandonment
A child is deemed abandoned under Connecticut law when the child "has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child." C.G.S. § 17a-112 (j)(3)(A). "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts and financial support are indicia of `interest, concern or responsibility' for the welfare of the child." In re Migdalia M.,6 Conn. App. 194, 208-09, cert.denied, 199 Conn. 809 (1986).
Mr. W. has abandoned Joseph. The analysis becomes more complex in discussing Ms. B. Nonetheless, this court finds that DCF has met its burden as to the statutory ground of abandonment.
Ms. B. did appear initially to want to visit with Joseph. She carried with her the picture of Joseph, taken in the hospital, at the time of his birth. By March of 2001 Ms. B. psychotic behavior made it impossible for DCF to continue to facilitate contact with Joseph, out of concern for Joseph's and others' safety. After March of 2001, Ms. B. did not exhibit the necessary care or concern for Joseph, she did not send gifts, cards, or attempt telephone contact to inquire about Joseph's welfare. Ms. B. refused treatment. Ms. B. became incarcerated in May of 2001 but never made DCF or any of her previous service providers aware of where she was from March until July of 2001. It is abundantly clear that the reason why Ms. B. abandoned Joseph is due to her refusal to obtain mental health treatment. The reasons behind Ms. B. abandonment of Joseph is not the critical linchpin in the court's decision. It is the parent's conduct, and not the causes behind the parent's conduct, that the court must consider in determining whether abandonment has been proven. It was Ms. B.'s choice to refuse further mental health and substance abuse treatment. Her refusal to be treated, exacerbated her psychotic behavior which made it unsafe for her to have even supervised contact with Joseph. Ms. B.'s refusal of treatment directly led to her incarceration and her failure to let anyone know her whereabouts from March to July of 2001. Ms. B.'s failure to treat led to the abandonment of Joseph.
Failure to Rehabilitate
CT Page 601
Statutory grounds exist to terminate parental rights when: "[the parent] of a child who has been found by the superior court to have been neglected or uncared for in a prior proceedings has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . ." C.G.S. § 17a-112 (j)(3)(B). In analyzing a respondent parent's rehabilitative status the court must look at the status as it relates to the needs of the particular child, and such rehabilitation must be foreseeable within a reasonable time. In re Roshawn R.,51 Conn. App. 44, 54-55 (1998).
Mr. W. chose not to come forward to ascertain paternity. He has apparently decided not to be involved in Joseph's life.
Ms. B. needed to engage and stay engaged in a comprehensive treatment plan that dealt with the myriad of issues in her life. To date she has failed to deal with any of her issues and she is actively psychotic, incarcerated and completely unamenable to treatment. Even if she were to engage in treatment today, Dr. Franklin testified that Ms. B. would need to be compliant with treatment for at least six months to sufficiently rehabilitate. She has never even come close to such compliance or sobriety. Joseph is almost one year old. He has known nothing but foster care and is a neglected and uncared for child. It is not in Joseph's best interest to wait for what would be nothing less than a miracle. There is absolutely no evidence to indicate that allowing further time to elapse will change the sad reality that Ms. B. will never sufficiently rehabilitate herself so that she could someday properly parent Joseph.
No ongoing Parent-Child Relationship
In determining whether there is any ongoing parent-child relationship, the court must engage in a two prong analysis. First it must be determined "(t)hat no parent-child relationship exists, and second, the court must look into the future and determine whether it would be detrimental to the child's best interest to allow time for such a relationship to develop." In re Savanna M., 55 Conn. App. 807, 815
(1999), C.G.S. § 17a-112 (j)(3)(D).
Mr. W. has never seen Joseph. He failed to come forward to determine paternity. There is clearly no parent/child relationship and this court finds no reason as to why it would be in Joseph's best interest to allow further time to elapse to see if Mr. W. changes his position.
Ms. B. saw Joseph only twice since his discharge from the hospital at the time of his birth. He was two months old at the time of the last CT Page 602 visit. Joseph was eight months old when the petitions to terminate parental rights were filed. As a practical matter there is no parent-child relationship between mother and child and Joseph clearly has no memories of his mother. What this court must consider is whether the reason for the lack of any parent-child relationship is because of the decisions and behavior of Ms. B. or are a result of `intrusive meddling' by the state.In re Valerie D., 223 Conn. 492 (1992); In re Shane P., 58 Conn. App. 234,242 (2000).
Joseph was placed in foster care at the time of his birth. Visits were suspended after the March visit fiasco at DCF. DCF decided, after consulting with Mr. Page, that no further visits were to occur until and unless Ms. B. furnished proof that she had re-engaged in mental health treatment. By May of 2001 a very psychotic Ms. B. became incarcerated and continued to refuse medication. DCF did not learn of Ms. B.'s incarceration until July of 2001, the month in which the termination of parental rights petitions were filed. While it could be argued that the facts of this case are similar to the ones set forth in In re ValerieD., there is a distinction. Unlike in In re Valerie D. it was Ms. B.'s decision to forego further treatment and to make her whereabouts unknown to DCF and the service providers that caused a lack of any relationship or contact between herself and Joseph. It is, therefore, Ms. B. and not the state, who "is largely responsible for the existence of the grounds upon which the termination is based." Id. at 532 fn.35. A lack of any parent-child relationship has been proven by clear and convincing evidence.
DISPOSITION
In the dispositional phase of a parental termination case, the court must consider whether DCF has proven by clear and convincing evidence that `termination is in the best interest of the child.' It is in Joseph's best interest to have the respondents' parental rights terminated.
In accordance with C.G.S. § 17a-112 (k) the court makes the following findings:
(1) The court must look at the timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parents.
Mr. W. never made himself available to the court, DCF or to Joseph. Therefore no services were possible as to him.
As indicated previously, there was a tremendous effort to provide the CT Page 603 necessary wrap around services to Ms. B. in 2000. Her noncompliance did not stop DCF and the other service providers from agreeing to re-engage in offering services to Ms. B. after Joseph's birth. Ms. B. refused to utilize the available services that would have been critical in any reunification attempt.
(2) This court finds, for reasons discussed earlier in this decision, that DCF made reasonable efforts to reunite the parents with the child pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended.
(3) According to State's Exh. A, p. 11 interim specific steps were entered at the time the order of temporary custody was obtained. Ms. B. did not comply with the steps.[10] She failed to keep her whereabouts known to DCF, failed to obtain treatment, failed to obtain and maintain adequate housing, failed to stay free of criminal behavior and failed to follow the recommendations of service providers.
Mr. W. never appeared to submit to the jurisdiction of court orders.
(4) Joseph has known only one family since birth, specifically his present foster family. He has no ties to his biological parents. Joseph is thriving in his foster home and is very bonded to his foster family. The foster family is willing to adopt Joseph.
(5) Joseph will be one year old in a few days. He has been in foster care since his birth. Permanency can be achieved through adoption.
(6) Any efforts Ms. B. were to make to alter her life so that Joseph could be returned to her would have to include prolonged and sustained mental and substance abuse treatment and compliance with taking antipsychotic medication. Ms. B. has never been compliant for any substantial period of time. Without said treatment, even unsupervised visitation cannot occur. Ms. B. cannot adequately care for herself never mind a young child.
Mr. W. has made no effort to alter his life to allow Joseph to possibly be a part of it.
(7) This court is unaware of any act or conduct of either parent against the other, or any conduct of any agency or any geographic or economic circumstances that has prevented either parent from maintaining a meaningful relationship with Joseph.
 CONCLUSION
CT Page 604
Based on the foregoing findings, the court determines that it is in the best interest of Joseph to terminate the parental rights of Ms. B. and Mr. W. Accordingly, the court hereby grants the termination petitions. The court further orders that the Commissioner of DCF is appointed statutory parent for the child. The Commissioner shall file with the court no later than thirty days following the date of judgment, a written report of efforts to effect a permanent placement for Joseph and file further reports as required by state and federal law.
 ___________________ Bernadette Conway, Judge of the Superior Court